<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRS IN VIVO HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> KELLY PETERS, <br><br> Defendant. | No. 24cv8223 (EP) (MAH) <br><br> **MEMORANDUM ORDER GRANTING PRELIMINARY INJUNCTION** |

**PADIN**, **District Judge.**

Defendant Kelly Peters signed an employment agreement when she was hired by her former employer, Plaintiff PRS In Vivo Holdings, Inc. ("PRS"). The agreement, among other things, contained a one-year non-competition clause specific to PRS' direct competitor (two months for any other company) and a one-year non-solicitation clause. Peters, believing PRS would not sue to enforce the agreement, left PRS to join that competitor. PRS now moves for a temporary restraining order and preliminary injunction to enforce the agreement. D.E. 8, 8-1 ("Mot."). Because the Court finds that PRS has demonstrated, among other prerequisites, a likelihood of demonstrating that the agreement's restrictive covenants are enforceable,[1] the Court will **GRANT** the preliminary injunction without a hearing.

---

[1] Subject to the unenforceable limitation, discussed below, as to *prospective* PRS clients.

I.      **BACKGROUND**[2]

PRS is a market research consultancy that specializes in behavior-driven shopper research. Compl. ¶ 1. PRS spun off from PRS IN VIVO USA ("In Vivo"), later rebranded as PRS' direct competitor, Behaviorally; many In Vivo employees became Behaviorally employees. *Id.* ¶ 16. Behaviorally and PRS utilize similar client management and business strategy software. *Id.* ¶ 17.

Before Peters worked at PRS, she worked in market research for seventeen years. Peters Decl. ¶ 15. Peters made "countless contacts in the industry, including at Clients A, B, and C."[3] *Id.* ¶ 16.

A.      **Peters Agrees to Non-Competition and Non-Solicitation Covenants**

PRS hired Peters in January 2023 as Senior Vice President, Client & Market Development. Peters Decl. ¶ 4. On January 16, 2023,[4] Peters "reviewed and signed" a "Confidentiality and Non-Competition Agreement" ("Agreement"). *Id.* ¶¶ 5-6 (citing D.E. 13-1, Ex. 1 to Peters Decl., at 8). The same day, Peters also signed an "Offer of Employment" ("Offer Letter"). *Id.* ¶¶ 7-8 (citing D.E. 13-1, Ex. 2 to Peters Decl., at 12). During Peters' time at PRS, she "continued to work with [her] preexisting contacts at [Clients A, B, and C]." *Id.* ¶ 17.

As relevant here, the Agreement contains a non-competition covenant. Specifically, the Agreement memorializes Peters' understanding that PRS

---

[2] These facts are drawn from PRS' Verified Complaint, verified by PRS executive Tom Dilley ("Complaint" or "Compl."), and Peters' sworn declaration. D.E. 13-1 ("Peters Decl."). *See Covertech Fabricating, Inc. v. TVM Bldg. Prods.*, No. 3:17-cv-196, 2017 U.S. Dist. LEXIS 177257, at *3-4 (W.D. Pa. Oct. 26, 2017) (issuing temporary restraining order based on facts in verified complaint). As detailed below, the facts material to resolving PRS' application, particularly the material contractual terms, are undisputed.

[3] Though the clients' names are redacted for the purposes of this Opinion, the Court notes that they are prominent within their respective industries.

[4] Several paragraphs of Peters' Declaration indicate that the Agreement and Offer Letter were dated January 16, 20<u>1</u>3, but this appears to be a scrivener's error. The documents themselves contain the correct 20<u>2</u>3 date.

2

>has invested substantial time, effort, resources and finances in the research, development and commercialization of the Company's products and/or services. Employee further agrees that if Employee engages in any business that is competitive with the company it will cause great and irreparable harm to the company, the monetary loss from which would be difficult, if not impossible to measure.

Agreement ¶ 3(a).

Recognizing Behaviorally's role as PRS' direct competitor, and that Behaviorally "would have a significant competitive advantage" because the latter's "senior leadership . . . knew so much about PRS, its methods and tools, and how PRS managed its client relationships," Compl. ¶ 17, the Agreement contained a non-competition covenant aimed specifically at Behaviorally.

That provision prohibited Peters from involvement with Behaviorally during her employment or for one year after the voluntary or involuntary end of her employment at PRS. Agreement ¶ 3(b)(i). The Agreement also contained a similar non-competition covenant for two months as to any competing business limited to a radius of 40 miles from any PRS office or "any location in which [Peters] has worked." *Id.* ¶ 3(b)(ii). And finally, the Agreement also contained a non-solicitation covenant barring Peters, for one year, from soliciting any PRS "employee, consultant[,] independent contractor[, or] client or . . . prospective client involved in active discussions with [PRS] or employees." *Id.* ¶ 3(c). The Agreement, memorializing Peters' understanding that her breach would result in PRS "suffer[ing] irreparable harm," authorized injunctive relief as an enforcement mechanism. *Id.* ¶ 4.

B. **Peters Begins Discussions With Behaviorally After Her Promotion**

In January 2024, PRS promoted Peters to Chief Commercial Officer ("CCO"), replacing Tom Dilley, who was promoted to Managing Director of North America after PRS fired Richard Bell, who joined Behaviorally. Peters Decl. ¶¶ 9, 11-12. Peters believes that Bell "was subject to a Confidentiality and Non-Competition Agreement with [PRS]," but that PRS "elected not to"

3

enforce it.  *Id.* ¶ 13.[5]  When PRS promoted Peters, it did not make Peters sign a new Offer Letter or Agreement.  *Id.* ¶ 10.

In March 2024, Peters began communicating with Behaviorally.  *Id.* ¶ 18.  Peters "immediately informed Mr. Dilley and [Peters'] co-worker, Jonah Berg, that Behaviorally [contacted Peters] about potential employment."  *Id.* ¶ 19.  On April 25, 2024, Peters met with Behaviorally representative Crispin Beale for coffee.  *Id.* ¶ 20.  Peters disclosed the meeting in advance to Dilley; Dilley told Peters "he understood the operational challenges [Peters] was having at PRS and further understood why [Peters] was meeting with Behaviorally."  *Id.*  Dilley "did not mention the . . . Agreement, nor did he express concern that PRS would attempt to block any future employment with Behaviorally."  *Id.*

On April 29, 2024, Peters "connected with Alex Hunt, Behaviorally CEO, for the purpose of setting up a time to discuss a potential position with Behaviorally."  *Id.* ¶ 21.  Peters again "alerted Mr. Dilley."  *Id.* ¶ 22.  And Dilley again told Peters "he understood why [Peters] was meeting with [the Behaviorally CEO] and expressed no concerns about [her] potential employment violating [the Agreement]."  *Id.*

PRS CEO Olivier Blanchet "reached out to [Peters] to discuss" Behaviorally and attempted to convince her to stay at PRS.  *Id.* ¶ 23.  Blanchet "did not express any concerns that [Peters'] potential employment with Behaviorally would violate [the Agreement]."  *Id.*  Blanchet "did not believe restrictive covenants were enforceable any longer in light of a recent [Federal Trade Commission ruling]."  *Id.* ¶ 24.  From Peters' perspective, these comments were consistent with

---

[5] In reply, Dilley confirmed that PRS elected not to enforce Bell's non-compete agreement because Bell's "impact on PRS'[s] business by associating with Behaviorally was not significant."  D.E. 19-1 ("Dilley Decl.") ¶¶ 5-7.

PRS' "historical trend of not attempting to enforce the [restrictive covenant] agreements generally." *Id.* ¶ 25.

    C.    **Peters Joins Behaviorally**

The parties do not agree on the exact circumstances surrounding Peters' departure from PRS. According to Peters, there was no active effort by either Dilly or Blanchet to threaten enforcing the Agreement. *Id.* ¶¶ 28, 29. Dilley asked Peters to ensure a smooth transition for clients Peters had worked with. *Id.* ¶ 30.

According to PRS, Peters was renegotiating her compensation; indeed, before she left, she agreed on an approximately $400,000 total compensation package and that PRS would pay approximately $6,000 toward Peters' healthcare. Dilley Decl. ¶¶ 17-21. According to PRS, Dilley *did* remind Peters of the Agreement's non-compete provision during a May 2024 remote meeting. *Id.* ¶ 15; D.E. 19-2 ("Berg Decl.")[6] ¶ 7. Moreover, according to PRS, both Behaviorally *and* Peters were aware of the provision, as evidenced by Behaviorally executive Crispin Beale's offer of "indemnity on the spot" to induce Peters to join Behaviorally. *Id.* ¶ 6 (citing D.E. 19-2 at 4).

On or about May 30, 2024, Peters accepted Behaviorally's employment offer. Peters Decl. ¶ 26. On June 3, 2024, Peters emailed her resignation letter to Dilly and Blanchet. *Id.* ¶ 27. On or about July 2, 2024, one of the two largest clients whom Peters managed while at PRS cancelled a PRS study. Compl. ¶ 29. The client stated that it was considering engaging Behaviorally and referenced a discussion that the client had with Peters. *Id.*

According to Peters, her emails to PRS clients—which did not copy PRS executives— were meant "to ensure a smooth transition" pursuant to Dilley's requests. Peters Decl. ¶ 32. These included an email that she would "see" the clients again at some point, which "simply meant that

---

[6] Reply Declaration of PRS Senior Vice President Jonah Berg, who reported to Dilley.

5

[their] paths would likely cross again given the relatively small size of [their] industry." *Id.* ¶ 33. Peters avers that she "did not then," and does not now, "have any intention of soliciting work" away from PRS. *Id.* ¶ 34.

### D. This Action and Motion

On July 22, 2024, PRS filed a civil action in this Court. *See PRS In Vivo Holdings, Inc. V. Kelly Peters*, Docket No. 2:24-cv-07941-EP-JBC. After PRS voluntarily dismissed that action on July 24, 2024 and re-filed in New Jersey state court, Peters promptly removed the action back to this Court.[7] D.E. 1.

The Complaint alleges six counts:

1. Breach of Contract
2. Breach of Implied Covenant of Good Faith and Fair Dealing
3. Breach of Fiduciary Duty
4. Unfair Competition
5. Unjust Enrichment
6. Misappropriation

On August 7, 2024, this Court directed Peters to show cause why injunctive relief should not issue, directed further briefing, and ordered a hearing for August 29, 2024. D.E. 11. Peters opposed, D.E. 13 ("Opp'n"), and PRS replied, D.E. 19 ("Reply").

Having reviewed the parties' papers, and particularly Peters' declaration in opposition, it is clear that there are no disputes of fact requiring resolution at a hearing.[8] Peters does not deny

---

[7] The parties do not dispute that this Court has diversity jurisdiction. PRS is incorporated in Delaware with a principal place of business in Parsippany, New Jersey, Peters resides in Chicago, Illinois, and the Complaint plausibly alleges greater than $75,000 in potential damages.

[8] "[A] preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue." *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982) (per curiam); *Securities & Exchange Commission v. G. Weeks Securities*, 678 F.2d 649, 651 (6th Cir. 1982) (oral testimony not a prerequisite to a fair hearing where decision on whether to grant preliminary injunction turns on legal issues).

6

signing the Agreement, or violating it; rather, she relies, among other arguments, on a ratification argument foreclosed by the Agreement itself.

## II.     LEGAL STANDARDS

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing the first two factors, which are considered the "'most critical'" factors. *Reilly*, 858 F.3d at 179 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504,

508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

Importantly, a preliminary injunction should not be issued where material issues of fact are in dispute. *See, e.g. Vita-Pure, Inc. v. Bhatia*, No. 14cv7831, 2015 U.S. Dist. LEXIS 42655, at *9 (D.N.J. Apr. 1, 2015) (denying injunction where factual disputes "preclude a determination that [the p]laintiffs have established a likelihood of success on the merits"); *Collick v. Weeks Marine, Inc.*, 397 Fed. App'x 762, 764 (3d Cir. 2010) (preliminary injunction is inappropriate where there is an "abundance of contradictory facts on both sides of the record").

### III. ANALYSIS

Peters addresses the first two (and most important) preliminary injunction factors. **First**, Peters argues that PRS will not succeed on the merits of its breach of contract claim because the Agreement's restrictive covenants are unenforceable. **Second**, addressing the same factor, Peters argues that PRS will not succeed on the merits of its breach of fiduciary duty and duty of loyalty claims. And **third**, Peters argues that PRS has failed to establish that injunctive relief is necessary to prevent irreparable harm.

### A. PRS Will Succeed on the Merits of Its Breach of Contract Claim

Because this is a diversity case, New Jersey state law controls. *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (This Court's "role in diversity cases is to apply state law as announced by the state's highest court."). To establish a breach of contract claim in New Jersey, a plaintiff must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Acteon, Inc. v. Harms*, No. 20-cv-14851, 2020 U.S. Dist. LEXIS

210932, at *9 (D.N.J. Nov. 6, 2020). Peters' arguments focus primarily, though not entirely, on the enforceability of the Agreement's restrictive covenants.

### 1. The restrictive covenants are likely enforceable

"A non-compete is not valid if its only purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal of the employer." *HR Staffing Consultants, LLC v. Butts*, No. 15cv3155, 2015 U.S. Dist. LEXIS 71220, at *22 (D.N.J. May 29, 2015), *aff'd*, 627 F. App'x 168, 172 n.5 (3d Cir. 2015) (citing *Solari Indus., Inc. v. Malady*, 55 N.J. 571 (1970); and then citing *Whitmyer Bros. v. Doyle*, 58 N.J. 25 (1971)). A non-compete "is enforceable to the extent that it is reasonable under all of the circumstances of the case." *Karlin v. Weinberg*, 77 N.J. 408, 417 (1978). A non-compete will be found reasonable if it "protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Id.*

Peters first challenges the non-compete as overbroad because it would apply upon voluntary resignation *or* termination. Opp'n at 6. Peters is correct that "a covenant by an employee not to compete after the termination of his employment is not, because of the countervailing policy considerations, as freely enforceable[.]" *Id.* (quoting *Solari*, 55 N.J. at 576). However, the distinction is irrelevant because Peters was *not* terminated. And more importantly, the *Solari* court also held that the non-compete "will nonetheless be given effect if it is reasonable in view of *all* the circumstances of the particular case." *Solari*, 55 N.J. at 576.

Here, the other circumstances render the covenant reasonable. First, as PRS argues, the provision is reasonably necessary to protect PRS' legitimate interests in its proprietary information, such as marketing and product strategies; customer relationships, goodwill, and reputation; and other specialized information to which an employee has been "exposed and enriched solely due to . . . employment." *ADP, LLC v. Kusins*, 460 N.J. Super. 368, 401 (App.

9

Div. 2019) (citing *Whitmyer Bros.*, 58 N.J. at 33; and then citing *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 638 (1988)).[9]

Here, there is no dispute that Peters' prominent position as CCO exposed her to significant proprietary client information, or that Peters "did not bring any clients to PRS and had not previously worked in the behavior driven market research segment," and therefore that Peters "had developed clients and client contacts entirely through her employment at PRS." Compl. ¶ 9.[10] Thus, in this context, the non-compete provision designed to prevent the disclosure of information to direct competitors, including Behaviorally, and maintain client relations was not unreasonable or unenforceable as a matter of law. *Ingersoll-Rand*, 110 N.J. at 626 ("Employers . . . have the right to protect their trade secrets, confidential information, and customer relations.").

Additionally, and contrary to Peters' argument, there is no indication that the restrictive covenants will cause undue hardship to Peters. The court must consider "the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." *Cmty. Hosp. Group, Inc. v. More*, 183 N.J. 36, 59 (2005). The reason for the employee's termination is also relevant; if the employee terminates the relationship, the court is less likely to find an undue hardship because the employee prompted the restriction. *See id.*

First, Peters herself catalyzed the restriction by voluntarily leaving PRS. Second, the temporal restrictions are not unreasonable. Temporal restrictions longer than the one-year restriction imposed here have been upheld by New Jersey courts. *See, e.g. Cmty. Hosp.*, 183 N.J.

---

[9] This matter can be differentiated from cases in which there is insufficient information provided about confidential or proprietary information, trade secrets, or customer lists. Unlike, for example, *US LBM Operating Co. 2009, LLC v. One Source Kitchen & Bath, Inc.*, No. 23cv2487, 2023 U.S. Dist. LEXIS 216318 (D.N.J. Dec. 5, 2023), PRS has adequately identified and described client information and PRS' use of various development tools. *See, e.g,* Compl. ¶ 17.

[10] Before Peters joined PRS, she "made countless contacts" and "continued to work with [her] preexisting contacts" after joining PRS. Peters Decl. ¶¶ 16-17.

at 59 (two years); *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 481 (D.N.J. 1999) (eighteen months); *A.T. Hudson & Co. v. Donovan*, 216 N.J. Super. 426, 433-34, (App. Div. 1987) (reversing dismissal and finding that two-year non-compete period was not per se unreasonable in consulting industry, which "involves close contact between the consultants and the management employees of the client," and that plaintiff's efforts "to attract represents a significant investment of time, effort and money which is worthy of protection").

And significantly, the year-long restriction applies *only* to Behaviorally. Two months after leaving PRS—which, as of this decision, has elapsed or will soon elapse—Peters is free to join any company *other* than Behaviorally, provided that she does not solicit PRS' clients with whom she had substantial contact until June 30, 2025.[11] *See Schuhalter v. Salerno*, 279 N.J. Super. 504, 513 (App. Div. 1995) (enforcing two-year non-solicitation provision). Indeed, in her own declaration, Peters references three such competitors: EyeSee, Designalytics, and Metrix Lab. Peters Decl. ¶ 27.

But while a one-year non-solicitation provision is enforceable against *existing* PRS clients, the Court agrees with Peters that the Agreement is unenforceable as against *prospective* PRS clients. The Agreement bars, for one year, solicitation of any "[PRS] client or . . . prospective client involved in active discussions with [PRS] or employees." ¶ 4. Based on this provision, PRS seeks an injunction barring Peters from soliciting "PRS prospects to which PRS devoted

---

[11] Peters does not challenge the geographic (40-mile) scope of the non-compete. New Jersey courts have held similar restrictions to be unreasonable. In those cases, however, there was evidence that the restriction would prove injurious to the *public*. *See Cmty. Hosp.*, 183 N.J. 36 at 49-50 (finding two-year period was reasonable, but 30-mile radius restriction was not because it limited public's availability to trained neurosurgeon in emergency room). Moreover, it is not clear that a geographic restriction would significantly impact Peters, who works remotely.

substantial resources and with which Peters either interacted or was materially involved in PRS' solicitation," subject to a "substantial contact" test. Reply at 13; D.E. 8 at 2, ¶ C.

There is no support for such a broad and vague description; the only case to address a similar clause in this district, *Newport Capital Grp., LLC v. Loehwing*, noted that the New Jersey Supreme Court has only "tacitly approved such an agreement . . . in *dictum*." tum. 2013 U.S. Dist. LEXIS 44479, *29 (citing *Solari*, 55 N.J. at 586). Even referring to it as *dictum* or "tacit[] approv[al]" overstates what can more fairly be characterized as a passing mention of a "general acknowledgment on the part of the plaintiffs that their legitimate interests would be adequately protected by a limited restraint against [the defendant's] dealing with any . . . actual customers or prospective customers in the United States with whom he had substantial dealings on [the plaintiff's] behalf." *Solari*, 55 N.J. at 586. This does not carry the force of law. Accordingly, an PRS has not demonstrated a likelihood of success on the merits on this issue, and a preliminary injunction will not issue as to prospective PRS clients.

    2.    *PRS did not modify or waive the Agreement in writing*

The factual disputes center on Peters' argument that the conduct of PRS executives Dilley and Blanchet, after Peters revealed that she was considering leaving for Behaviorally, modified the Agreement and/or otherwise precludes its enforcement. Opp'n at 4. First, Peters argues that PRS' selective enforcement of similar restrictive covenants, prevents enforcement here. PRS concedes that it seeks to enforce restrictive covenants against Peters that it did not seek to enforce against former PRS Managing Director for North America Richard Bell, who was "discharged . . . for performance reasons." Dilley Decl. ¶¶ 5-8. However, selective enforcement of contractual provisions does not, by itself, vitiate a restrictive covenant. *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172 n.5 (3d Cir. 2015) (decision to forego placement fee in one instance "does

not eliminate [plaintiff's] interest in incentivizing clients and employees to keep their contracts with it").

Peters also argues that PRS executives, after she informed them that she was considering leaving to join Behaviorally, either did not express any intent to enforce the restrictive covenants or told Peters that they "did not believe restrictive covenants were enforceable any longer in light of a recent ruling by the Federal Trade Commission ("FTC")."). Peters Decl. ¶¶ 22-24.

However, as PRS highlights, no matter which version of the facts is true, the Agreement required any modifications or waivers to be in writing, the former in a writing signed by both parties. *See* Agreement ¶¶ 6,[12] 8.[13] Peters does not allege any written modification or waiver; accordingly, the Court will enforce the Agreement. *See HR Staffing*, No. 2:15-3155, 2015 U.S. Dist. LEXIS 71220, at *40 (D.N.J. May 29, 2015) (finding that separate agreement was not a contract "signed by both parties," as the relevant employment agreement containing the non-compete required for modification).[14]

### B. PRS Will Be Irreparably Harmed

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004).

---

[12] "This Agreement may be modified only by a written [sic] executed by both" PRS and Peters.
[13] "Any waiver of a default under this Agreement must be made in writing and shall not be a waiver of any other default concerning the same or any other provision of this Agreement. No delay or omission in the exercise of any right or remedy shall impair such right or remedy or be constructed as a waiver. A consent to or approval of any act shall not be deemed to waive or render unnecessary to or approval of any other subsequent act."
[14] Having found that PRS has demonstrated a likelihood of success on the merits as to its breach of contract claim, the Court need not analyze the likelihood of success on its breach of fiduciary duty claim. Mot. at 12; Opp'n at 7.

13

This includes, as PRS argues, "the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships," which "may be the basis for a finding of irreparable harm." *Laidlaw, Inc. v. Student Transp. of Am.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) (citing *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1258-59 (3d Cir. 1985) (employer's customer relationships and good will protectible through covenants not to compete)). Moreover, the Agreement itself acknowledges that breach would cause irreparable harm to PRS. ¶ 3(a); *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 U.S. Dist. LEXIS 50524, at *23-24 (D.N.J. June 13, 2009) (finding irreparable injury where employee agreed that violating agreement would cause irreparable harm to employer) (citing *Dice v. Clinicorp., Inc.,* 887 F. Supp. 803, 810 (W.D. Pa. 1995) (contractual provision may constitute evidence, albeit non-dispositive, of irreparable harm)).

Peters argues that PRS was on notice as early as March 2024 that Peters might leave for Behaviorally and "did nothing for approximately four months" to enforce the restrictive covenants. Opp'n at 10. This delay, Peters argues, demonstrates a lack of irreparable harm. *Id.* at 10-11. But "nothing" is not a fair description of PRS' actions at that time; Peters' own declaration notes discussions with PRS executives about Peters' concerns regarding PRS and her conversations with Behaviorally. *See* Peters Decl. ¶¶ 19-23. And Peters did not *actually* leave PRS until June 2024; PRS brought suit shortly after Peters joined Behaviorally. Reply at 13-14; Peters Decl. ¶ 27. Thus, there was no appreciable delay.

  C. **An Injunction Serves the Public Interest**

Although this is a private dispute, issuance of an injunction to enforce an agreement and private contractual rights between sophisticated parties serves the public interest. *See Score Board Inc. v. Upper Deck Co.*, 959 F.Supp. 234, 240 (D.N.J. 1997). "Judicial enforcement of non-

14

competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Scholastic Funding Grp., LLC v. Kimble*, No. 07-557, 2007 U.S. Dist. LEXIS 30333, at *33 (D.N.J. Apr. 24, 2007). Peters does not address this argument. Accordingly, the Court finds that PRS has satisfied this prong of the preliminary injunction analysis.

## IV. CONCLUSION AND ORDER

For the reasons above, the Court will **GRANT** PRS' motion, D.E. 8, seeking a preliminary injunction, subject to the limitation discussed above regarding the solicitation of *prospective* PRS clients.[15] Specifically, it is:

**ORDERED** that Defendant is **ENJOINED** from:

1. directly or indirectly associating with Behaviorally, Inc. ("Behaviorally") in any capacity, including but not limited to as an employee, contractor, consultant, or otherwise, through and including June 30, 2025;

2. directly or indirectly soliciting any PRS client to do business with any person or entity other than PRS through and including June 30, 2025 provided that the client was one with which Peters worked or about which she acquired material information during her employment by PRS;

3. directly or indirectly using or disclosing PRS' confidential or proprietary information; and it is further

**ORDERED** that, within seven days:

Defendant must (i) stipulate to and agree with counsel for Plaintiff upon a non-party forensic vendor and (ii) jointly submit to this Court in conjunction with Plaintiff a forensic protocol

---

[15] The August 29, 2024 hearing is canceled as moot.

targeted at retrieving, preserving, returning to Plaintiff, and remediating from the Defendant's possession, custody, or control all of Plaintiff's business information. The retrieval, preservation, return, and remediation process shall be completed within thirty (30) days of issuance of this Order. Plaintiff and Defendant will share equally all costs for the non-party forensic vendor associated with this process, with each party reserving the right to request that the Court reallocate some or all of its share of those costs at a later date; and it is further

  **ORDERED** that the parties shall proceed into expedited discovery, to be supervised by the Magistrate Judge.

August 27, 2024

                                 Evelyn Padin, U.S.D.J.